# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 19
The People &c.,
   Appellant,
  v.
Daria N. Epakchi,
   Respondent.

Justin W. Smiloff, for appellant.
David A. Day, for respondent.

DiFIORE, Chief Judge:

The Appellate Term for the Ninth and Tenth Judicial Districts has adopted a rule of criminal procedure under which, absent special circumstances, the People cannot reprosecute a defendant by filing a new simplified traffic information after the original

simplified traffic information was dismissed for facial insufficiency under CPL 100.40 (2) for failure to provide a requested supporting deposition in a timely manner.  Because that rule has no basis in the Criminal Procedure Law and contravenes our holding in *People v Nuccio* (78 NY2d 102 [1991]), we reverse.

In September 2013, a police officer issued a uniform traffic ticket (a type of simplified traffic information)[1] to defendant for failing to stop at a stop sign in violation of Vehicle and Traffic Law § 1172 (a).  Defendant returned a plea of not guilty on the back of the ticket and requested a supporting deposition of the police officer setting forth factual allegations providing reasonable cause to believe that defendant committed the charged offense (*see* CPL 100.25 [2]).  Not having received the supporting deposition within the time prescribed by law, defendant moved to dismiss the simplified traffic information for facial insufficiency as defined by CPL 100.20, 100.25, and 100.40 (2).

In December 2013, the parties appeared before a judicial hearing officer (JHO) assigned to the Suffolk County Traffic and Parking Violations Agency.[2]  In accordance

---

[1] A simplified traffic information "is a statutory creation designed to provide an uncomplicated form for handling the large volume of traffic infractions and petty offenses" (*Nuccio*, 78 NY2d at 104).  As relevant here, "a simplified traffic information is sufficient if it complies with the form required by the Commissioner of Motor Vehicles" (*id.*).  A uniform traffic ticket complies with the form (*see* Vehicle and Traffic Law § 207; 15 NYCRR part 91).

[2] The Suffolk County Traffic and Parking Violations Agency assists the Suffolk County District Court in the disposition of traffic violations (*see* General Municipal Law §§ 370-371).  A JHO may adjudicate low-level traffic violations (*see* Vehicle and Traffic Law § 1690 [1]).

with the JHO's instructions, the prosecutor mailed defendant the supporting deposition of the police officer who ticketed her, along with a "superseding" simplified traffic information. The parties reappeared in court two weeks later, at which point a different JHO dismissed the original simplified traffic information. Immediately afterwards, in the hallway of the courthouse, the prosecutor personally served defendant with the police officer's supporting deposition and the new simplified traffic information; these documents were then filed with the local court.

Defendant moved to dismiss the new simplified information, citing, among other statutes, CPL 170.30 and 170.40, as well as case law from the Appellate Term for the Ninth and Tenth Judicial Districts. Defendant submitted that the Appellate Term "considers it an abuse of discretion when a trial court permits a motorist to be tried based upon a new simplified information and supporting deposition after an original information has been dismissed for failure to timely serve and file a supporting deposition." The People opposed the motion, arguing that our decision in *Nuccio*, which permits a new prosecution after the dismissal of a simplified information for facial insufficiency, was the controlling law, and that the Appellate Term was not following the rule set forth in that case. Defendant's motion was denied in a written decision on the ground that the Appellate Term's procedural rule, formulated in part before *Nuccio* was decided, contravened this Court's holding that the Criminal Procedure Law does not prohibit reprosecution on a new, facially sufficient information after a dismissal for failure to comply with CPL 100.40.

The matter proceeded to trial. The police officer testified that he observed defendant driving her car at approximately 35 miles per hour across an intersection without stopping at the stop sign posted there. After hearing this testimony and defendant's contradicting testimony that she made a complete stop for two seconds, the trial JHO found defendant guilty of violating Vehicle and Traffic Law § 1172 (a) and sentenced her to pay a fine, fees, and a surcharge.

The Appellate Term for the Ninth and Tenth Judicial Districts reversed the judgment of conviction, professedly "as a matter of discretion in the interest of justice"; vacated the order denying defendant's motion to dismiss; granted the motion; and ordered the fine to be remitted if already paid (63 Misc 3d 161[A], 2019 NY Slip Op 50913[U], *1 [App Term, 2d Dept, 9th & 10th Jud Dists 2019]). The court rested its ruling on a line of its own cases requiring special circumstances for the People to prosecute a new simplified information after the original accusatory instrument was dismissed for failure to serve a requested supporting deposition under CPL 100.40 (2) (id. at *2). The court noted that it "consistently" dismissed judgments of conviction under such circumstances, reasoning that a "ruling to the contrary would defeat the very purpose of CPL 100.40 (2), disregard the interest of judicial economy, and erode the confidence of the public in the criminal justice system" (id. [internal quotation marks omitted]). In the Appellate Term's view, no special circumstances were shown to exist in this case, and therefore the People could not reprosecute defendant (id.). In light of its conclusion, the court did not "reach defendant's

remaining contentions" (*id.*).  A Judge of this Court granted leave to appeal (34 NY3d 1016 [2019]).

As a threshold matter, defendant contends that we do not have jurisdiction to entertain this appeal because the Appellate Term characterized its ruling as an exercise of discretion in the interest of justice.  But we are not bound by an intermediate appellate court's characterization of its own order, and we must determine for ourselves whether its reversal of the judgment of conviction presents a question of law for our review (*see People v D'Alessandro*, 13 NY3d 216, 219 [2009]; *People v Giles*, 73 NY2d 666, 668, 670 [1989]).  First, there can be no dispute that the issue before us—the validity of a procedural rule fashioned by the Appellate Term and invoked by defendant in the trial court to dismiss the criminal action—was fully litigated in the court of first instance (*see* CPL 470.05 [2]).  Second, the Appellate Term has created a rule of criminal procedure requiring a trial court, in the absence of special circumstances, to dismiss a new simplified traffic information after a previous simplified traffic information was dismissed as insufficient on its face for failure to timely serve a requested supporting deposition under CPL 100.25 and 100.40.[3]

_____

[3] Failure to provide a requested supporting deposition, after a defendant's timely request, renders a simplified information insufficient on its face, but it is not a determination of the facts of the underlying charges (*see* CPL 100.40 [2]; 100.25 [2]).  Dismissal of a legally defective simplified information under CPL 170.30 (1) (a) and 170.35 (1) (a) is based on a different ground than dismissal "in furtherance of justice" under CPL 170.30 (1) (g) and 170.40.  A local criminal court, in considering a motion to dismiss the accusatory instrument in the interest of justice, must not only examine a nonexhaustive list of ten factors to determine whether compelling circumstances for dismissal exist, but also set forth its reasons for dismissal on the record (*see* CPL 170.40).  In this respect, and contrary to the dissent's apparent belief, we have previously recognized that a court's authority to grant a motion to dismiss on this basis is not unbridled (*see e.g. People v Berrus*, 1 NY3d

This presumptive bar to a prosecution that does not meet the special-circumstances requirement constitutes a legal standard designed to govern the disposition of motions to dismiss accusatory instruments in situations presenting the specified procedural posture. Whether the procedural rule imposed by the Appellate Term is consistent with the Criminal Procedure Law and this Court's precedent is a question of law appealable and reviewable by this Court (*see Giles*, 73 NY2d at 671; *Douglass*, 60 NY2d at 205). Thus, we have jurisdiction over this appeal.[4]

---

535, 536 [2003]); there is no inherent authority to dismiss a criminal prosecution outside of the parameters authorized by the Criminal Procedure Law (*see People v Douglass*, 60 NY2d 194, 204 [1983]); and a court's exercise of its discretionary authority under the statute is reviewable for an abuse of that discretion—a question of law. In this Court, the parties did not address the propriety of a dismissal under CPL 170.30 (1) (g) and 170.40. We therefore express no opinion on this issue and leave it for consideration by the courts below upon remittal. Unlike the dissent, we see no reason to discuss the reviewability of intermediate appellate courts' exercise of their interest-of-justice jurisdiction, as here the Appellate Term did not engage in any such exercise. Instead, the Appellate Term engrafted its own procedural rule onto the Criminal Procedure Law's dismissal scheme and relied in part on prior decisions holding that a trial court "abuse[s] its discretion" by permitting a defendant to be prosecuted on a new simplified information and supporting deposition (*People v Rosenfeld*, 163 Misc 2d 982, 983 [App Term, 2d Dept, 9th & 10th Jud Dists 1994]; *see People v Rathgeber*, 23 Misc 3d 130[A], 2009 NY Slip Op 50653[U], *2 [App Term, 2d Dept, 9th & 10th Jud Dists 2009]; *People v Aucello*, 146 Misc 2d 417, 420 [App Term, 2d Dept, 9th & 10th Jud Dists 1990])—again, a question of law within the scope of our review.

[4] Under the State Constitution, this Court's jurisdiction is limited to questions of law in noncapital criminal cases (*see* NY Const, art VI, § 3). Importantly, the constitutional grant of authority was designed to give this Court "supreme power to authoritatively declare and settle the law uniformly throughout the state" (*Reed v McCord*, 160 NY 330, 335 [1889]).

A simplified traffic information is a written accusation by a police officer or other authorized public servant, filed with a local criminal court, charging a person with committing a nonfelony traffic offense (infraction or misdemeanor); although it need not contain factual allegations of an evidentiary nature to support the charge, it can serve as a basis for commencing—and, under specified circumstances, prosecuting—a criminal action (*see* CPL 1.20 [5] [b]; 100.10 [2] [a]; *People v Beattie*, 80 NY2d 840, 841 [1992]). The simplified traffic information must satisfy the prescriptions of CPL 100.25, including the requirement that, upon timely request by the defendant, the complainant police officer or public servant serve on the defendant or defense counsel, within a specified time frame, a supporting deposition containing factual allegations of reasonable cause; the supporting deposition must then be filed with the court (*see* CPL 100.25 [1], [2]; 15 NYCRR 91.7). If the police officer or public servant fails to comply with this requirement, the simplified traffic information is rendered "insufficient on its face" (CPL 100.40 [2]) and, as such, subject to dismissal upon the defendant's motion (*see* CPL 170.30 [1] [a] [providing that a court may dismiss a simplified information on the ground that it is "defective, within the meaning of section 170.35"]; 170.35 [1] [a] [providing that a simplified information is "defective" when it is not "sufficient on its face pursuant to the requirements of section 100.40"]).

In *Nuccio*, this Court considered "whether charges in a local criminal court may be prosecuted by a sufficient long-form information after a prior simplified information, charging the same offenses, has been dismissed for failure to supply the supporting

depositions required by CPL 100.25 (2)" (78 NY2d at 103). Our "short answer" was that "prosecution can be renewed on a facially sufficient information following such a dismissal" for the simple reason that "the Criminal Procedure Law does not prohibit it" (*id.* at 104 [citing practice commentaries on CPL 100.25 (2) and 170.30]). Further, the Court noted that the "history on the subject" supported the conclusion that "reprosecution of nonfelony charges" was permissible: not only did the common law permit "resubmitting charges against a defendant," but the legislature, when it enacted the Criminal Procedure Law in 1970, "chose to treat dismissals of indictments separate from dismissal of informations and misdemeanor complaints" (*id.* at 104-105).

Comparing the respective dismissal provisions, the Court pointed out that the legislature "expressly barred" reprosecution, without court authorization, of indictments dismissed for legal insufficiency, but "failed to include a similar bar for informations dismissed on those same grounds" (*id.* at 105 [comparing CPL 210.20 (4) with 170.30 (1) (a)]). Indeed, a court may dismiss an indictment if it is "defective," and, "[i]n the absence of authorization to submit or resubmit, the order of dismissal constitutes a bar to any further prosecution of such charge or charges, by indictment or otherwise, in any criminal court within the county" (CPL 210.20 [1] [a]; [4]). By contrast, a court may dismiss a "defective" information, simplified information, prosecutor's information, or misdemeanor complaint, but there is no provision barring further prosecution of the charges so dismissed (*see* CPL 170.30 [1] [a]). Stated otherwise, although the Criminal Procedure Law requires a prosecutor to seek permission from the court to resubmit evidence and

charges to a grand jury after dismissal of a defective or legally insufficient indictment, there is no similar statutory requirement for filing a new accusatory instrument after dismissal of a facially insufficient simplified information. In *Nuccio*, we concluded that "the different treatment accorded indictments and informations in the statute manifests the Legislature's intention to permit reprosecution for nonfelony charges when the information is dismissed for legal insufficiency" (*Nuccio*, 78 NY2d at 105).

As expressly recognized by the court of first instance in denying defendant's motion to dismiss, *Nuccio* governs where, as here, a simplified traffic information is dismissed for facial insufficiency. The Appellate Term's formulation of a procedural rule contrary to the Criminal Procedure Law is without force or effect. Defendant's attempt to distinguish the newly filed accusatory instrument in *Nuccio* (a "long-form" information)[5] from the newly filed accusatory instrument at issue here (a simplified traffic information accompanied by a supporting deposition with sufficient factual allegations) is unavailing. *Nuccio* did not hinge its analysis on the nature of the subsequently filed instrument. Instead, as discussed

---

[5] A "long-form" information is not one of the accusatory instruments defined in the Criminal Procedure Law (*see* CPL 100.55 [4], [5]). This qualifier is a shorthand to distinguish informations that contain legally sufficient sworn factual allegations in support of the charges (*see* CPL 1.20 [4]; 110.10 [1]; 100.15 [1], [3]) from simplified informations, which do not (*see* CPL 1.20 [5], 110.10 [2]). To be facially sufficient, an information— supplemented, as the case may be, by a supporting deposition—must contain nonhearsay allegations in support of the charges (*see* CPL 100.40 [1] [c]). On the other hand, where a defendant has timely requested a supporting deposition, a simplified information is facially sufficient only if the supporting deposition is provided within the time prescribed by law (*see* CPL 100.40 [2]). As observed by the motion court, the accusatory instrument used in the subsequent filing here—a simplified traffic information accompanied by a nonhearsay supporting deposition—was equivalent to a long-form information.

above, it focused on the Criminal Procedure Law's distinction between dismissals of indictments and dismissals of local-court accusatory instruments. As in *Nuccio*, the original accusatory instrument here was a local-court accusatory instrument subject to dismissal as facially insufficient because the People failed to timely provide the supporting deposition requested by defendant. The Criminal Procedure Law does not prohibit reprosecution upon a facially sufficient accusatory instrument after such a dismissal, whether by information or by simplified traffic information with a supporting deposition. Accordingly, the People were entitled to reprosecute the traffic violation after dismissal of the first simplified traffic information.

The Appellate Term's special-circumstances requirement erects an extrastatutory barrier to reprosecution that contravenes the Criminal Procedure Law as clarified by *Nuccio*. As we have previously held, lower courts are not free to dismiss criminal actions based on considerations falling outside the several grounds set forth in CPL 170.30 (*see Douglass*, 60 NY2d at 200 [rejecting the proposition that lower courts had authority to dismiss for "calendar control"]). Allowing dismissals without a basis in the Criminal Procedure Law "would not only be an abdication of the judiciary's responsibility to safeguard the public and promote respect for the law, but would also create a situation whereby a trial court's dismissal, rendered without consideration of any established guidelines, would be incapable of meaningful appellate review" (*id.* at 205).

In sum, the Appellate Term lacks authority to create a procedural rule, requiring special circumstances for the renewed prosecution of a traffic offense after a previous dismissal for failure to provide a requested supporting deposition, that is inconsistent with *Nuccio* and the courts' authority under the Criminal Procedure Law.

Accordingly, the order of the Appellate Term should be reversed and the case remitted to the Appellate Term for consideration of issues raised but not determined on the appeal to that Court.

WILSON, J. (dissenting):

Quite understandably, the majority of our court is concerned about equal justice for all. So am I. Criminal defendants—indeed, parties generally—should not receive differential treatment based on the geography of the court system. When the People fail to

comply with a statute requiring that a simplified traffic information be supplemented with a supporting sworn statement, whether to permit or forbid re-prosecution for that violation is debatable as a policy matter.  However, the ability to re-prosecute the offense of running a stop sign should be the same in Long Island as in Buffalo (or vice versa).

Though I fully concur in the majority's ends, I cannot agree to its means.  A century of our settled jurisprudence bars us from the majority's course.  The intermediate appellate courts are statutorily empowered to alter or abandon results that are technically permissible but nonetheless incompatible with the ultimate aim of the judicial system: advancing the interests of justice (CPL 470.15 [3] [c]).  We are not, nor can we review such exercises by the intermediate appellate courts (*see People v Fava*, 58 NY2d 807, 808 [1983]).

The mismatch between our statutory powers of review and those of the intermediate appellate courts unquestionably hobbles the Court of Appeals from ensuring uniformity in the law.  The majority recognizes that problem.  The straightforward solution lies in the hands of the legislature which should harmonize our powers of review with those of the intermediate appellate courts.

Instead, to address the immediate problem, the majority attempts to cram the Appellate Term's decision into our present statutory authority by proposing that the Appellate Term has not really used its interest-of-justice powers, but rather has created a rule of law reviewable by our court.  However, the purported rule of law is, as I explain below, not.  The majority would have no quarrel with an appellate court announcing that, in the ordinary course, it will not exercise its interest-of-justice power to bar re-prosecution unless the defendant can show exceptional circumstances.  Indeed, it would be fair to say

that for most types of circumstances in which the intermediate appellate courts are asked to take an action in the interest of justice (or do so *sua sponte*), they apply a strong presumption against doing so, and exercise that power only when the defendant has proven "special circumstances deserving of recognition" (*People v Marshall*, 106 AD3d 1, 11 [1st Dept 2013], quoting *People v Chambers*, 123 AD2d 270, 270 [1st Dept 1986]; *see also People v Hudson*, 217 AD2d 53, 55 [2d Dept 1995]; *Marshall*, 106 AD3d at 11 ["Ordinarily, this Court will not exercise its interest of justice jurisdiction absent 'extraordinary circumstances'"]).  We have long held that those determinations are unreviewable by us.  Here, all the Appellate Term has done is to reverse the presumption, requiring the People, instead of the defendant, to show special circumstances.  If the majority has an explanation of why placing the burden on the People to show "special circumstances" creates a rule of law, but placing that same burden on defendants does not, it escapes me.

The good news is that, if a strong presumption converts interest-of-justice decisions by the lower courts into rules reviewable by us, today's decision should make a vast array of heretofore unreviewable exercises of discretion reviewable by our court.  Whenever we can detect a pattern or presumption in the lower courts' exercise of their interest-of-justice power, we now have a reviewable rule.

The better news is that today's decision should cause us to revisit why our court system is established so that the lower courts may deviate from legislatively-prescribed rules in the interest of justice, but its highest court cannot.

I.

The power of a court to dismiss an accusatory instrument in the interest of justice

> "has ancient roots. Its New York legislative antecedents alone go back more than a century to the adoption, in 1881, of sections 663, 664 and 671 of the former Code of Criminal Procedure . . . . Throughout this history, and no less today, its thrust, even to the disregard of legal or factual merit, has been 'to allow the letter of the law gracefully and charitably to succumb to the spirit of justice' (*People v Davis*, 55 Misc 2d 656, 659)"

(*People v Rickert*, 58 NY2d 122, 126 [1983]). In his commentaries on the Criminal Procedure Law, Judge Bellacosa described this power as "evok[ing] the true and unfortunately perceived of as old-fashioned, sometimes courageous 'judging'" in which it is "the spirit of the law that is alive in this section, rather than the mere letter" (Joseph W. Bellacosa, Practice Commentary, McKinney's Cons Laws of NY, Book 11A, CPL 210.40 at 236 [1982 ed.]). The power of courts to make decisions in the interest of justice is woven into the fabric of New York's judicial system and extends far beyond the power to dismiss accusatory instruments (*see People v Williams*, 97 Misc 2d 24, 31 [NY Co Ct 1978] ["Legislative enactments permitting courts to make a variety of determinations 'in the interests of justice' or 'in furtherance of justice,' are not new to our State . . . . These enactments have been an integral part of the criminal procedural process for many years, and appear throughout the CPL"]). In dozens of areas of the law, the legislature has supplemented statutory rules regarding civil and criminal procedure with instructions for lower courts to deviate from those rules when necessary to ensure a just result—a recognition of the need for flexibility in carrying out their statutory duties (*see People v Belge*, 41 NY2d 60, 62-63 [1976] [Fuchsberg, J., concurring] [noting that CPL 210.40

"constitutes the current codification of earlier enactments which expressed the need for a residuum of inherent discretion to act in the unusual case that cries out for fundamental justice beyond the confines of conventional considerations of 'legal or factual merits of the charge or even on the guilt or innocence of the defendant'"], quoting *People v Clayton*, 41 AD2d 204, 206 [1973]; *People v Davis*, 55 Misc 2d 656, 659 [Sup Ct, NY County 1967] ["The criminal law is at best an imperfect instrument. Necessarily, it speaks in absolute terms and occasionally catches in its net one who, should he be convicted of an offense would suffer more grievously than justice would require"]).

As a modest sample, trial courts may, in the interest of justice, dismiss the charges filed against a criminal defendant (*e.g.* CPL 210.40 [dismissal of an indictment]; CPL 170.40 [dismissal of informations]); reduce felony charges to non-felony charges (CPL 180.50); extend statutory deadlines (*e.g.* CPL 30.30 [4] [b] [speedy trial]; CPL 100.25 [3] [supporting depositions]); remove juvenile cases to Family Court (CPL 330.25 [1]); and relieve youthful offenders "from the onus of a criminal record" (CPL 720.20).  On the civil side, the legislature has given trial courts similar powers with regards to vacating default judgments (CPLR 2005 [default as a result of attorney error]), extending time for service of process (CPLR 306-b), and granting trial preferences to litigants when "the interests of justice will be served by an early trial" (CPLR 3403 [a] [3]).  The list goes on.[1]

----

[1] *E.g.* CPL 60.42 (5) (admissibility of evidence of victim's prior sexual conduct); CPL 170.25 (4) (b) (release of defendant during the pendency of grand jury proceedings); CPL 170.55 (1)-(2) (adjournment of proceedings and release of defendant in contemplation of dismissal); CPL 170.56 (adjournment in contemplation of dismissal in cases involving marihuana); CPL 180.40 (remand of cases from superior court to local criminal court); CPL 180.80 (3) (release of defendant held pending disposition of felony complaint); CPL

However, the broadest interest-of-justice powers rest with the Appellate Division and Appellate Term, a product of legislative expansion over time (*see* Jill Paradise Botler et al, *The Appellate Division of the Supreme Court of New York: An Empirical Study of its Powers and Functions as an Intermediate State Court*, 46 Fordham L Rev 929, 950 [1979] ["The Appellate Division's power has grown to enable it to perform those functions that it was designed, and later modified, to serve: the supervision of the lower courts; the screening of cases for the court of appeals; and the promotion of substantial justice . . . The chief source of the Appellate Division's power, however, has been New York's tradition of allowing litigants the widest possible review in the interests of justice"]).  As early as 1855, intermediate appellate courts had the legislative authority to overturn criminal convictions, even when the verdict was supported by both statutory law and the weight of the evidence, if "justice require[d] a new trial" (L 1855 Ch 337 § 3).  In its original form, that power was limited to certain remedies (ordering a new trial) and certain offenses

190.80 (extension of statutory period to hold a defendant prior to the issuance of an indictment); CPL 200.20 (3) (separate trials for multiple offenses charged in the same indictment); CPL 250.10 (2) (late filing of psychiatric evidence used to demonstrate a mental disease or defect); CPL 260.30 (7) (admissibility of new, non-rebuttal evidence after presentation of principal cases); CPL 390.50 (2) (disclosure of pre-sentence report); CPL 420.35 (2-a) (c) (waiver of mandatory fees); CPL 440.20 (3) (reconsideration of motions to set aside verdicts); CPL 610.25 (2) (costs for procuring witnesses or physical evidence); CPL 630.20 (4) (securing attendance of witnesses confined in institutions within New York State); CPL 680.20 (1) (issuance of commissions for the examination of out-of-state witnesses); CPL 700.50 (notice and disclosure of eavesdropping and video surveillance to subjects of warrants); CPLR 103 (c) (conversion of motions into special proceedings); CPLR 2305 (c) (waiver of costs incurred to reproduce and transport records); CPLR 3117 (a) (3) (v) (admission of prior depositions in evidence at trial).

(convictions for capital offenses and those with a minimum punishment of imprisonment for life) (*id.*).

Since the mid-19th century, the legislature has steadily expanded the powers of New York's intermediate appellate courts to act in the interest of justice. By 1882, those courts were permitted to order a new trial in all criminal convictions, not just capital cases (L 1882 Ch 360 § 1 [amending § 527 of the Code of Criminal Procedure]). In 1919, the legislature granted the Appellate Division the power to review and reduce sentences imposed by trial courts (L 1919 Ch 282 § 1), a predecessor to the Appellate Division's present authority to modify sentences that are "unduly harsh or severe" (CPL 470.15 [6] [b]). Finally, when the legislature enacted the modern Criminal Procedure Law in 1970, it set forth three bases upon which an intermediate appellate court could reverse a lower court decision, and in doing so, created the broadest standard to date concerning the power of our intermediate appellate courts to ensure a just result in each case. Section 470.15 of the CPL provides that:

> "3. A reversal or a modification of a judgment, sentence or order must be based upon a determination made:
>
> (a) Upon the law; or
>
> (b) Upon the facts; or
>
> (c) As a matter of discretion in the interest of justice; or
>
> (d) Upon any two or all three of the bases specified in paragraphs (a), (b) and (c)" (CPL 470.15 [3]).

The power of intermediate appellate courts to modify or reverse a judgment "as a matter of discretion in the interest of justice" includes the ability to dismiss or reduce charges,

order a new trial, revise criminal sentences, and consider questions of law regardless of whether those questions were addressed in the court of first instance (CPL 470.15 [6]).

While the powers of intermediate appellate courts to decide issues in the interest of justice has evolved over time, the Court of Appeals' authority and jurisprudence regarding the interests of justice have remained remarkably static. Neither CPL 450.90, which defines the scope of orders appealable to our court, nor any of its predecessor statutes has granted the Court of Appeals the ability to review decisions made by intermediate appellate courts "as a matter of discretion in the interest of justice." Unlike the intermediate appellate courts, the Court of Appeals lacks the authority to reverse or modify a decision below even if, without disturbing the facts as found below, the interest of justice so requires. One wonders why.

In light of that statutory background, we have consistently held that when an intermediate appellate court exercises its discretion to modify or reverse a trial court decision in the interest of justice, that discretionary act is not reviewable by our court (*see People v O'Brien*, 164 NY 57, 58 [1900] ["We have no power to review a judgment of reversal in a criminal case unless it appears affirmatively in the body of the order that . . . the reversal was ordered for error of law only. Inasmuch as the order in this case does not, upon its face, exclude the possibility that it was based upon an examination of the facts, or made as matter of discretion, no question of law is presented by the appeal"]; *see also Elezaj v P.J. Carlin Const. Co.*, 89 NY2d 992, 994 [1997]; *Brown v City of New York*, 60 NY2d 893, 894 [1983]).

In our 1884 case of *People v D'Argencour* (95 NY 624), we intimated that our court might be able to review decisions granting a new trial in the interest of justice to determine if the appellate court abused its discretion (*see id.* at 625 ["The power conferred upon the Supreme Court by the Code of Criminal Procedure on appeal in a criminal action, to grant a new trial . . . where justice requires it . . . is discretionary, and where it does not appear that the discretion has been abused, the decision of that court is not reviewable here"] [citation omitted]). However, twenty years later we confined those intimations to dicta in *People v Calabur* (178 NY 463 [1904]):

> "Although a previous motion to dismiss the appeal in this case was denied upon the theory intimated, but not decided, in *People v. D'Argencour* (95 N. Y. 624), to the effect that if it appeared that the discretion of the Appellate Division had been abused . . . when we examine other decisions where that question was actually involved, we find that it has been uniformly held that an order of reversal in a criminal case that does not, upon its face, exclude the possibility that it was based upon an examination of the facts or made as a matter of discretion, presents no question of law reviewable by the Court of Appeals" (*id.* at 463-464).

Since *Calabur*, we have invariably held that our court lacks the power to review exercises of the intermediate appellate courts' interest-of-justice powers on the theory that the legislature has committed that power solely to those courts and removed such decisions from the class of cases amenable to Court of Appeals review (*see e.g. People v Kibbe*, 35 NY2d 407, 414 [1974] ["(A)ppellants' contention that the Appellate Division should have reversed for its claimed inadequacy in the interests of justice may not be here reviewed, for the intermediate appellate court's refusal to so reverse was exclusively within its discretion"] [citation omitted]). We may only review such decisions if the lower court's

opinion excludes entirely the possibility that the decision was made as a matter of discretion in the interest of justice (*see People v Thomas*, 44 NY2d 759, 760 [1978] ["(S)ince the possibility that the Appellate Division's decision was premised on an exercise of discretion cannot be excluded, the appeal must be dismissed"]).[2]

A simple application of our precedent requires a dismissal of the People's appeal. The Appellate Term reversed Ms. Epakchi's conviction "as a matter of discretion in the interest of justice." The Appellate Term's express characterization of the basis for its decision accords with the substance of its holding. The Appellate Term's decision embodies the court's understanding of what justice requires. The Appellate Term has concluded that, absent special circumstances, re-prosecution of traffic tickets is inappropriate when a defendant requested but did not receive a supporting deposition explaining the charges against her, and thereby had the charges dismissed. In the view of the Appellate Term, re-prosecutions in those instances would "erode the confidence of the public in the criminal justice system" and fail to serve the interests of judicial economy (63 Misc 3d 161[A], 2019 NY Slip Op 50913[U], *1 [App Term, 2d Dept, 9th & 10th Jud Dists 2019]). That the Appellate Term is exercising its discretion in the interest of justice is evident in its discretionary allowance of re-prosecution of the same defendant, based on the same charges as filed in the original traffic ticket, when special circumstances exist. One could disagree with the substance of the Appellate Term's conclusions regarding what

---

[2] As an example, if the parties have properly preserved an issue in the court of instance, and the Appellate Division erroneously concludes the issue was not preserved, but purportedly reaches it in the interest of justice, we may review the issue, because the issue was in fact preserved (and the Appellate Division's contrary holding is an error of law).

actions or omissions of the prosecution unfairly prejudice the defendant and erode public confidence in the judicial system, but that is true of all lower court exercises of the interest-of-justice power. A century of precedent bars our court from second guessing the Appellate Term's exercise of its interest-of-justice powers, putting an end to our review.

To circumvent our precedent, the majority recasts the Appellate Term's decision as being based "upon the law" and not, as the Appellate Term explained, as a matter of discretion in the interest of justice. The majority's reading of the Appellate Term's orders might have some force if the Appellate Term had created an absolute bar to re-prosecution, but it has not. The Appellate Term has upheld the filing of a subsequent accusatory instrument, charging the same defendant with the same offense as the originally-dismissed information, when the People demonstrate that special circumstances exist warranting re-prosecution (*see People v Alexander*, 31 Misc 3d 145[A], 2011 NY Slip Op 50942[U] [App Term, 2d Dept, 9th & 10th Jud Dists 2011]).

The Appellate Term has not adopted a rule as the majority claims (majority op at 5), but rather a presumption to guide the exercise of discretion for when it will permit or deny a second prosecution of a Uniform Traffic Ticket when the original prosecution was dismissed for want of a supporting deposition. The use of presumptions by lower courts is a common feature of the interest of justice, born of experience gained over time and informed by the court's substantive understanding of what justice requires (*see e.g. Davis*, 55 Misc 2d at 659 [explaining that the court would exercise its power to dismiss an indictment only in "appropriate but rare circumstances"]). Such presumptions do not erase

the discretion that lies at the heart of the Appellate Term or Appellate Division's interest-of-justice power.

I do not perceive a conflict between the interest of justice and the use of presumptions, nor do the intermediate appellate courts, and nor—until today—has our court. If the Appellate Term's practice is a rule, so is every circumstance in which our intermediate appellate courts have stated that they will "rarely" act in the interest of justice or do so only when the defendant has shown "special" or "extraordinary circumstances" (*e.g. People v Giglione*, 34 Misc 3d 72, 75 [App Term, 2d Dept, 9th & 10th Jud Dists 2011] ["As defendant has not shown that any extraordinary circumstances exist, we decline to modify the sentence"]; *People v Hodges*, 13 AD3d 979, 979 [3d Dept 2004] [declining to modify a defendant's sentence in the interest of justice "due to the absence of extraordinary circumstances"]).

Compare, for example, the reviewable "rule" of the Appellate Term here with the First Department's "rule" for vacating convictions in the interest of justice:

> "In order to exercise our interest of justice jurisdiction, there must exist 'special circumstances deserving of recognition' (*People v Chambers*, 123 AD2d 270, 270 [1st Dept 1986]). In other words, this Court will not exercise its interest of justice jurisdiction absent 'extraordinary circumstances' (*People v Marshall*, 106 AD3d 1, 11 [1st Dept 2013] [internal quotation marks omitted], *lv denied* 21 NY3d 1006 [2013]).

> This case and this defendant do not present special or extraordinary circumstances that would warrant exercising our interest of justice review power" (*People v Williams*, 145 AD3d 100, 108 [1st Dept 2016]).

If the People do not comply with the statutory requirement to provide a supporting declaration within 30 days of a request, the Appellate Term will, in the interest of justice, bar re-prosecution unless the People demonstrate "special circumstances." If a defendant has failed to preserve a claim of error, the First Department will not exercise its interest-of-justice power to decide the issue and vacate a conviction unless the defendant demonstrates "special circumstances."[3] Sauce for the goose is sauce for the gander: either both or neither constitutes a reviewable rule.

I share the goal the majority seeks to achieve—harmony in criminal justice—but its approach mischaracterizes the nature of the interest-of-justice power and is foreclosed by our precedent. Even if I could reconcile the majority's decision with our precedent or the lower courts' persistent practice of employing interest-of-justice presumptions that rely upon "special," "unusual," or "extraordinary" circumstances, the majority's approach lacks

---

[3] As a further example, the Second Department will not exercise its interest-of-justice power to review unpreserved challenges to the sufficiency of plea allocutions "[i]n the absence of unusual circumstances" (*People v Fudge*, 113 AD2d 900 [2d Dept 1985]; *People v Taylor*, 111 AD2d 836 [2d Dept 1985]). The rationale of today's decision would permit us to review such discretionary refusals and effect our own judgment about what the interest of justice requires. This rule constitutes a broad expansion of our powers of review, because, as described above, the interest-of-justice power is found throughout the civil and criminal codes (*see Ruben v American & Foreign Ins. Co.*, 185 AD2d 63, 67 [4th Dept 1992] ["It is well established that a court maintains inherent power to vacate a judgment in the interest of justice . . . . The enumerated grounds in CPLR 5015 are neither preemptive nor exhaustive and were not intended to limit that power (*see*, *Government Empls. Ins. Co. v Employers Commercial Union Ins. Co.*, 62 AD2d 123, 127; Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C5015:11, at 476)"]).

basic efficacy and the ability to serve as a consistent standard going forward.  Note, for example, how the results would change if the Appellate Term had reversed the trial court in this case but stated only that it did so "as a matter of discretion and in the interest of justice," without further elaboration.  The New York Law Reports are replete with decisions in which an appellate court reverses or modifies an order in the interest of justice without any explanation (*e.g. People v Reyes*, 210 AD2d 68, 68 [1st Dept 1994]; *People v Senghor D.*, 240 AD2d 589, 589 [2d Dept 1997]; *People v Hirsh*, 106 AD3d 1546, 1548 [4th Dept 2013]; *People v Johnson*, 58 AD2d 1029, 1029 [4th Dept 1977]), or, conversely, declines to exercise its discretion in the interest of justice without informing the parties why (*e.g. People v Secrest*, 236 AD2d 839, 839 [4th Dept 1997]; *People v Jemes*, 132 AD3d 1361, 1362 [4th Dept 2015]).  Those decisions raise the same concerns that the majority grapples with today (*i.e.*, arbitrary and under-explained decisions; geographic disparities in the administration of justice).  In some ways, they are worse—the majority disagrees with the substance of the Appellate Term's presumption, but it can at least discern its contours.

The majority's newly-created reviewability doctrine cannot reach this vast substrate of lower court decisions to harmonize them.  Moreover, its selective approach to reviewing decisions made in the interest of justice will only exacerbate the problems it seeks to resolve.  For an appellate court to safeguard its determination of what justice requires, all it must do is reverse or modify a decision in the interest of justice without any explanation.  Absent an explicit presumption or other statement of a general practice for the majority to

transmute into a rule of law, such holdings would once again become unreviewable.[4]  We should encourage the lower courts to engage in reason-giving, but the majority's lopsided treatment of lower court decisions does the opposite.

Our decision today is an implicit acknowledgement of a much broader issue: the Court of Appeals' lack of interest-of-justice powers impedes our ability to carry out our essential functions (*see* Larry Cunningham, *Appellate Review of Unpreserved Questions in Criminal Cases: An Attempt to Define the "Interest of Justice"*, 11 J App Prac & Process 285, 313 [2010] ["There is no standard other than the 'interest of justice.' This 'standard' gives no guidance to the courts that have to apply it on a daily basis. Worse, since only the intermediate appellate courts have this discretion, there is no guidance from the State's highest court, the Court of Appeals, let alone a check from that court on the improper exercise of interest-of-justice discretion"]).

A most peculiar oddity of our judicial system is that only the state's highest court has no ability to make decisions that are necessary to further the interest of justice when the strict interpretation of substantive or procedural rules says otherwise.  As discussed

---

[4] In this case for example, the Appellate Term on remand is free to exercise its interest-of-justice power once again and conclude that a second prosecution of Ms. Epakchi is unwarranted.  That ruling could rest explicitly on such considerations as Ms. Epakchi's age at the time of the offense (just past her 17th birthday) or the minor nature of the violation (running a stop sign) or the absence of any explanation for the People's noncompliance with the statute, but it could also be made without any written explanation or only with a passing nod to the familiar and opaque refrain "[u]nder the circumstances of this case, and in the interests of justice" (*Roberts v State*, 23 AD2d 615, 615 [3d Dept 1965]) the prosecution should be dismissed.  That the same result could arise, albeit with less illumination as to the court's reasoning, suggests that the majority's doctrine is concerned solely with the appearance of differential treatment and not its actual occurrence.

below, the historical reasons for granting the intermediate courts, but not the state's high court, the power to make rulings necessitated by the interest of justice are irrelevant today. Meanwhile, the absence of interest-of-justice powers interferes with the fulfillment of our basic mandate to foster the development of the law, ensure statewide harmony in the administration of justice, and do substantial justice in each case. I applaud the majority for recognizing the Court's need to ensure that the lower courts meet the terms of that mandate, but pretending that the Appellate Term's decision to flip the presumption turns unreviewable discretionary decisions into a reviewable rule of law is neither consistent with our precedent and the existing legislative design, nor a thoughtful way to address a much more fundamental problem than prosecutions for traffic infractions.

## II

I cannot conclude that placing the burden on the People to disprove the need for justice is any more or less of a rule than placing the burden on defendants to prove it. The majority's approach contravenes our settled precedent and the legislature's decision that such rulings are unreviewable by our court. It also offers no coherent rule going forward, and encourages the intermediate appellate courts, when they wish to act in the interest of justice, to offer no explanation for their decisions, ensuring that we will not meddle with the power granted them but withheld from us. Therefore, I follow the "time-honored tradition for courts or their members to suggest legislative change when the cases before them seem to so require" (*People v Mackell*, 40 NY2d 59, 64–65 [1976] [Breitel, C. J., concurring]) and describe how this appeal highlights the need for the legislature to grant interest-of-justice powers to the Court of Appeals.

As I noted at the outset, the legislature has steadily expanded the interest-of-justice powers of the trial and intermediate appellate courts, although it has yet to grant the Court of Appeals such abilities.  The peculiar result is that the interest of justice is a defining feature of civil and criminal justice in every New York court but ours.

The historical reasons for limiting the Court of Appeals' powers of review, relative to the intermediate appellate courts, primarily involved managing caseloads (*see* Arthur Karger, *Powers of the New York Court of Appeals* § 2:1, at 19 [3d ed. rev. 2005] ["From the time of its inception in 1847, until comparatively recently, the history of the jurisdiction of the Court of Appeals revolved around its struggle to cope with the demands of a volume of business exceeding its capacity"]).  In the late 19th century, at a time when the interest-of-justice powers of the intermediate appellate courts were ascendant, the Court of Appeals struggled with a four-year backlog of undecided cases (Arthur Karger, *The New York Court of Appeals: Some Aspects of the Limitations on its Jurisdiction*, 27 Rec. New York City Bar Ass'n 370, 370 [1972]).  The overwhelming backlog faced by the Court of Appeals was a perennial problem: in 1862, the Court had a staggering 1,378 pending undetermined cases (Francis Bergan*, The History of the New York Court of Appeals, 1847-1932*, at 47 [1985]).  To give the Court of Appeals a fresh start, the constitutional convention of 1867-68 created the "Commission of Appeals" (*id*. at 92-93), staffed by a combination of outgoing judges of the Court of Appeals and fresh gubernatorial appointments.  The Commission was assigned the yeoman's work of paring down the Court's backlog, a task it undertook in parallel with the official Court of Appeals, which continued to forge ahead with new appeals (*id*. at 93, 120-128).  By constitutional amendment, the original

Commission was renewed for three years and then lapsed in 1875 after clearing the Court's

backlog (*id*. at 122).  Despite the fresh start, the Court of Appeals was again besieged by

so great a backlog that the voters amended the constitution, in 1889, to create an entire

second division of the Court of Appeals, staffed by Supreme Court justices, to once more

work through the accumulation of high court appeals (*see generally id*. at 132-136; Karger,

*Powers of the New York Court of Appeals* § 2:1, at 22).

The historical backlogs explain to a substantial extent the discrepancies between our

powers of review and those of the intermediate appellate courts.  When the Appellate

Division was created in the constitutional convention of 1894, it was endowed with the

power to review non-final orders and, if necessary, reweigh findings of fact made at the

trial court level (Bergan*, History of the New York Court of Appeals* at 202).  We were not

given such broad powers of review, although the legislature (via statute) and the people

(via constitutional amendment) have over the years expanded our powers as needs have

arisen.[5]

Three points are worth noting with respect to the interest of justice.  First, a century

of jurisdictional innovation, including the constitutional amendments of 1985, have

---

[5] For example, as the role of administrative agencies broadened over the 20th century, voters approved a constitutional amendment permitting our court to hear appeals from non-final orders of the Appellate Division affecting administrative proceedings (NY Const, art VI, § 3 [b] [5]; *see generally* Bernard S. Meyer et al, *The History of the New York Court of Appeals, 1932-2003*, at 38 [2006]; Harold L. Korn, *Civil Jurisdiction of the New York Court of Appeals and Appellate Divisions*, 16 Buff L Rev 307, 322 [1967]).

substantially assuaged the concerns of an unmanageable backlog. In recent years, the Court of Appeals docket has fallen to historic lows.[6]

Second and more importantly, the interest of justice is a power exercised at the discretion of the court (*see* Botler, *The Appellate Division of the Supreme Court of New York* at 970-971 [describing the Appellate Division's restraint in exercising its power to reach unpreserved issues of law in the interest of justice]). In selecting when to invoke that discretionary power, we would be guided by the lodestar of whether the issue presented is leaveworthy and of statewide importance. The discretionary nature of the interest-of-justice power substantially alleviates concerns of undue caseloads. Indeed, as explained below, discretion to decide issues as necessary in the interest of justice will often be a boon to judicial efficiency.[7]

---

[6] In 2019, the Court heard 108 appeals, a number that is one quarter of the size of the average across the preceding 70 years. The reforms of the 1980s mark a clear turning point. Since 1990, the Court of Appeals has decided on average 209 appeals per year as compared with 580 appeals per year for the three decades prior to the 1985 constitutional amendment (*see* New York Court of Appeals, "Annual Reports," https://www.nycourts.gov/ctapps/annrpt.htm [last accessed March 15, 2021] [collecting statistics by year]). The legislative changes did not convert the Court of Appeals into a purely certiorari court like the United States Supreme Court, but moved it substantially in that direction. The caseload of the Court of Appeals is now only slightly greater than that of the U.S. Supreme Court.

[7] We should also not view the efficiency of the judicial system solely from the perspective of the Court of Appeals. Query whether judicial economy is best served by the need to remit this case back to the Appellate Term, a result mandated by the current statutory framework. In a different legislative world, we could have reached the interest-of-justice question ourselves and conclusively resolved the current litigation. Instead, we must remit to the Appellate Term for that court to make yet another determination as to the interest of justice, based upon the same record we have before us today. (For anyone keeping score at home, that marks the fifth time this case will appear before an appellate court, quite a run for a $100 traffic ticket).

Finally, our inability to make decisions as necessary in the interest of justice is an impediment to advancing each of our principal goals: developing statewide uniform legal standards, doing justice in the cases before us, and fostering public confidence in the judicial system.

Take, for example, the ability of appellate courts to decide issues that were not originally argued before the court of first instance and therefore have not been preserved for appellate review. The power to reach unpreserved issues in the interest of justice is one of two examples that the legislature specifically cites in the CPL as a core interest-of-justice power of the intermediate appellate courts (*see* CPL 470.15 [6] [a]). Our court has no comparable statutory authorization; as a partial judicial fix, we have developed a narrow doctrine for reaching unpreserved issues of law.[8] Our adherence to a strict view of preservation regularly leads to a waste of judicial resources—appeals are accepted, briefed and argued, only for important issues to escape review when it turns out that an argument

---

[8] The first category of cases involves what we have termed "mode of proceeding errors" (*People v Agramonte*, 87 NY2d 765, 769 [1996]). Where "'the error complained of goes to the essential validity of the proceedings conducted below' such that 'the entire trial is irreparably tainted,' it need not be preserved to present a question of law reviewable by this Court" (*id*. at 770, quoting *People v Patterson*, 39 NY2d 288, 296 [1976], *affd sub nom Patterson v New York*, 432 US 197 [1977]). However, "[o]nly fundamental defects in judicial proceedings . . . fall within this very narrow category of so-called 'mode of proceedings' errors" (*id*.). Second, we have at times claimed that we could review an unpreserved issue "if it could not have been avoided by factual showings or legal countersteps had it been raised below" (*Bingham v New York City Tr. Auth.*, 99 NY2d 355, 359 [2003]; *see also Telaro v Telaro*, 25 NY2d 433, 438 [1969] ["If the exception presents clear error, and one of materiality, which may have influenced the fate of the trial, an appellant may be indulged in bringing it to notice on his final appeal"]). Although promising in theory, the times when we have actually found that an unpreserved issue met this exception are rare, rendering it mere milquetoast in application.

was not fully presented in the court of first instance. Frequently, there is disagreement within the Court about whether an issue was sufficiently preserved, leading to a cottage industry of opinions focused on the niceties of preservation instead of the substantive question of statewide importance that brought the appeal to the Court in the first place (*compare Jin Ming Chen v Ins. Co. of the State of Pennsylvania*, 36 NY3d 133, 139 n 2 [2020] [holding that the parties did not preserve an argument that the defendant owed some, but not all, of the post-judgment interest at stake in the case] *with Chen*, 36 NY3d 133, 149, 154 n 5 [Wilson, J., dissenting] [concluding that the issue of dividing post-judgment interest was properly preserved because it had been raised and argued before the trial court]).

Perhaps the most unsettling aspect of our preservation jurisprudence is its effect on the development of the law. To give a recent example: there are approximately 33,000 foreclosure actions currently pending in the New York court system.[9] Many of these foreclosure actions were initiated pursuant to uniform lending instruments issued by Fannie Mae; others make use of similar standard-form provisions that govern the rights of borrowers and lenders under the mortgage (*see Freedom Mtge. Corp. v Engel*, —NY3d— , 2021 NY Slip Op 01090, at *2 n 1 [Feb. 18, 2021]). In January, we heard argument in four consolidated appeals, each involving a variant of the same issue: whether the unilateral

_____

[9] This figure was the total reported at the end of 2019, shortly before the COVID-19 related restrictions on residential mortgage foreclosure actions took effect (*see* Lawrence K. Marks, *2019 Report of the Chief Administrator of the Courts on the Status of Foreclosure Cases Pursuant to Chapter 507 of the Laws of 2009*, at 2 [2019], available at http://ww2.nycourts.gov/sites/default/files/document/files/2019-12/ForeclosureAnnualReport2019.pdf [last accessed March 15, 2021]).

decision by a lender to discontinue a foreclosure action is sufficient to "de-accelerate" a previously accelerated loan, even if the lender does not otherwise communicate its intent to return a loan to its pre-accelerated state.  Before our court, one of the litigants argued for the first time that we had missed a fundamental question: do lenders even have the contractual authority to de-accelerate a loan unilaterally?  However, because that issue was raised for the first time on appeal, it fell beyond our powers of review (*see Freedom Mortgage*, 2021 NY Slip Op 01090 at \*4 [noting that before the trial court "the borrowers did not dispute the noteholders' right to revoke"]; *id*. at \*10 [Wilson, J., concurring]; *id*. at \*10 [Rivera, J., dissenting]).

This is not a rare occurrence.  Legal issues interlock; the importance of some sub-issues becomes more apparent as litigation progresses, and not every issue is invariably preserved.  For decades, members of this Court and legal commentators have sought judicial reform of the Court's strict preservation doctrine to address these and other scenarios that impede our ability to declare what the law is (*see e.g.* Brian J. Shoot, *The Legislature's Power to Correct the Anomaly of Benefitting from A Failure to Preserve an Argument for Appellate Review*, 80 Alb L Rev 1323 [2017]; Matthew Bova, *A Sufficiency-of-the-Evidence Exception to the New York Appellate Preservation Rule*, 19 CUNY L Rev 1 [2015]).  In *Misicki v Caradonna* (12 NY3d 511 [2009]), Judge Smith memorably encapsulated the inanity that can arise from assuming away half of a whole case when a crucial legal issue has not been properly presented or preserved.  In that case, interpreting a regulation concerning "heavy equipment" as if it pertained to the hand tools used by one

of the litigants was "an exercise akin to deciding whether I would be a bicycle if I had wheels" (*id*. at 524 [Smith, J., dissenting]).

The mismatch between the Appellate Division's power to hear unpreserved arguments and our own, more limited power, results in other bizarre contortions. For example, we have repeatedly held that when the Appellate Division exercises its interest-of-justice power to reach an unpreserved issue of law, our court is powerless to review the Appellate Division's rule of law even though its decision constitutes binding precedent in the department in which it was decided (*see Feinberg v Saks & Co.*, 56 NY2d 206, 210-211 [1982]). In successive years, Judges Pigott and Smith both critiqued that doctrinal oddity in writings that are logical, compelling, and remain as yet unadopted by our court. In *People v Riley* (19 NY3d 944 [2012]), Judge Pigott correctly noted that

> "There is nothing in CPL 470.05 that prohibits this Court from reviewing a legal issue . . . [where] the question was reached by the Appellate Division in the exercise of its discretionary power to reach an unpreserved legal issue . . . The fact that the *nisi prius* court did not rule on an important question of law does not . . . give the Appellate Division license to decide the issue of law without fear of review, as the Appellate Division has done here. Indeed, I doubt very much that the Appellate Division would generally seek such authority, being far more comfortable knowing that this Court will be the final arbiter. I cannot accept that the Legislature intended to bring about the unfortunate procedural circumstance in which the Appellate Division decides a legal issue for the State, yet we are powerless to reach it" (*id*. at 948-949 [Pigott, J., dissenting]).

Echoing Judge Pigott, Judge Smith described the following year how our adherence to the "fiction that we are jurisdictionally barred from reviewing unpreserved issues"—even when the Appellate Division has created binding legal precedent by reaching those issues

in the interest of justice—"does not follow from any statute, does not make sense, and sometimes—as in this case—rewards a party for failing to preserve a legal issue" (*Hecker v State*, 20 NY3d 1087, 1088 [2013] [Smith, J., concurring]).

Of course, there are good reasons not to reach every unpreserved issue, but the distinguishing feature of the Appellate Division's statutory authority is that the legislature has entrusted the Appellate Division with discretion to determine whether in the interest of justice it should reach an unpreserved issue of law. Despite our cardinal role in developing and harmonizing the law, we have no such explicit statutory power, and have shied away from creating a judicial workaround to what our court has perceived as a lack of legislative authorization to reach unpreserved issues of law.

Development of the law and judicial economy would both be better served by an interest-of-justice power that gave our court the discretion to decide issues as needed in the interest of justice. So too would the important end of reducing geographic disparities in the administration of justice. As this case highlights, the intermediate appellate courts develop different practices for whether and how to exercise their interest-of-justice powers in various recurring circumstances.

The disparate results that follow disparate standards have for decades been a focus of reform by experts in appellate justice. As one example: in 1981, our court asked the American Judicature Society to conduct a thorough study of the operations and efficacy of New York's appellate justice system. Its final assessment concluded:

> "The Study Group has given particular attention to the area of review of the exercise of discretion, because of a growing concern among both the bar and the judiciary that the

Court's current approach to 'discretionary' rulings results in inadequate supervision of lower courts and inconsistent outcomes in different Departments of the Appellate Division.

The theory behind the Court of Appeals' general reluctance to become involved in discretionary matters is that in contrast to the Appellate Division, the Court of Appeals does not possess all the discretionary powers of a *nisi prius* court and should limit its involvement in discretionary rulings to those few matters presenting reviewable issues of law. Superficially, this approach to a review of discretion seems consistent with the Court's principal function as a law-declaring body.

On close analysis, however, the "abuse" standard seems ill-equipped to enable the Court of Appeals to discharge its other important functions of providing guidance to the lower courts and harmonizing inconsistent trends among the Departments of the Appellate Division. The problems become particularly apparent where two Departments have evolved different standards to guide the exercise of *nisi prius* discretion, or where recurring fact patterns continued to be handled on an unguided ad hoc basis . . . .

[An] example comes from a recent application for leave to appeal in a criminal case. The Appellate Division, Second Department, reversed a criminal conviction 'as a matter of discretion in the interest of justice,' on the ground that the jury had not been given cautionary instructions concerning note-taking. The People's application for leave to appeal noted the vast diversity of opinion around the State as to whether any note-taking by jurors should be allowed in criminal cases as a matter of law or policy. Yet the application acknowledged some uncertainty concerning the Court's power to review the purportedly discretionary ruling of the Appellate Division" (Robert MacCrate et al, *Appellate Justice in New York*, American Judicature Society, at 82-83 [1982], citing *People v DiLuca*, 85 AD2d 439, 446 [2d Dept 1982]).

Reacting to the *DiLuca* decision and the divergent rulings made in the interest of justice,

the American Judicature Society recommend that

"the Court give favorable consideration to applications for leave to appeal in cases where the Departments of the Appellate Division have adopted divergent standards for the

> exercise of discretion . . . . This change would serve the important objectives of promoting uniformity in the administration of justice throughout the State" (*id.* at 84).

As a state high court with a smaller docket than that of our intermediate appellate courts, our court is well placed to survey the landscape of different uses of the interest-of-justice power and, when appropriate—and as the majority has done today—exercise our judgment of what the interests of justice requires in light of the lessons learned from the different departments. In doing so, we would be fulfilling an essential purpose, one entrusted to us by the drafters of the 1894 constitutional amendments who emphasized the importance of ensuring a "consistent and harmonious system" of justice in which the law would be "the same for the whole State" (explanatory statement of the Judiciary Committee, 2 Rev Rec, 1894 NY Constitutional Convention at 464).

Finally, the power to review orders and judgments in the interest of justice is a vital means of promoting the ends of substantial justice that our legal system is meant to serve. Ensuring that individual litigants and communities receive a fair and just resolution is a vital concern, both in its own right and for its effects on public faith in the judicial system. In New York, the interests of justice serve those ends (*see Williams*, 97 Misc 2d at 33 ["Adjudications made 'in the interests of justice' have not been limited to trivial points of pleading or procedure, but have occasioned the most far-reaching consequences, including, as we have seen, such profound determinations as whether a person remains a defendant or not, and whether his conviction should be reversed"]).

Often, the decisions of the lower courts made in the interest of justice reveal a deep sense of humanity and care for the parties before them; they are among our courts' finest

decisions. When HIV and AIDS decimated New York in the 1980s and 1990s, it profoundly changed what a punishment could mean for someone living with the virus. Some lower courts in this state responded. Herman L.—homeless, impoverished, and with a history of addiction—was arraigned on minor drug charges. He was released pending trial so that he could seek drug counseling and participate in a clinical trial for people living with HIV (*People v Herman L.*, 198 AD2d 71, 71-72 [1st Dept 1993], *affd* 83 NY2d 958 [1994]). Over 21 months, he participated in both programs, sticking with his drug treatment plan. Over those same 21 months, the trial court observed Mr. L.'s physical condition deteriorate until he became "as thin as a rail" and "could hardly stand" (*id*. at 72). In the court's view, a trial and incarceration of Mr. L. for minor drug charges would achieve little. He was winning his battle against drug addiction but losing the battle against HIV. Over the People's objection, the trial court dismissed the charges against him. The Appellate Division affirmed, reasoning that

> "there are times when the ordinary processes by which justice is dispensed must be laid aside if justice is to be done. Indeed, justice in its truest aspect neither trivializes the offense nor the situation of the alleged offender. This, it would seem to us, is such a time, for the prosecution of Herman L. while accomplishing little if anything to promote in any real way either public safety or the rule of law, will predictably succeed only in blighting what remains of Mr. L.'s drastically abbreviated existence. Such a pointlessly harsh result is, we think, precisely what the discretion afforded pursuant to CPL 210.40 was designed to avoid" (*id*. at 74).

Our court performs weighty tasks. We aim to promote the development of thoughtful legal standards, while minimizing arbitrary disparities in the outcomes of lawsuits and prosecutions. Like any court, we also decide the fates of individual litigants. We determine

whether a criminal defendant will receive a new trial, whether families can stay together or come apart, and whether access to the ballot has been improperly denied. As the history of the power in New York State has shown, the interest of justice serves all of those aims.

III.

The majority's response, buried in a footnote, that "a court's authority to grant a motion to dismiss on this basis is not unbridled" (majority op at 5 n 3) rests on a fundamental misunderstanding of our jurisprudence and the legislature's action. The two cases cited, *People v Berrus* (1 NY3d 535 [2003]) and *People v Douglass* (60 NY2d 194 [1983]), concern legislative limitations on the authority of *trial courts*, not appellate courts, found in CPL 170.30 and 170.40. Indeed, the legislature enacted those standards in response to a direct suggestion by our court (*see Belge*, 41 NY2d at 62 ["To the extent that the section now fails to prescribe specific criteria . . . it is open to misuse and effective appellate review is made difficult, if not impossible. . . . We invite the attention of the Legislature to this predicament"]). However, the legislature placed no such restrictions on the appellate courts' interest-of-justice power. The Appellate Term's statutory authority to reverse lower court decisions "as a matter of discretion in the interest of justice" mirrors the discretionary standard that in *Belge* (and in every other case in our court's history) we have held to be unreviewable.

Were we to take the majority's footnote at face value—to mean that even the interest-of-justice power of the intermediate appellate courts is subject to review by our court for abuse of discretion ("a question of law" as the majority writes)—we would have drastically expanded our ability to review a host of decisions heretofore decidedly

unreviewable, including the review of unpreserved issues of law (if, for example, we concluded that an appellate court had abused its discretion in failing to entertain an unpreserved question of law or in failing to reduce a sentence).

Perhaps the majority means what it has tucked into its footnote, and is moving towards the adoption of the views of commentators and past Judges of this Court who have believed that, for example, the ability to reach unpreserved issues of law surely falls within our powers (*see Hecker*, 20 NY3d at 1088 [Smith, J., concurring]; Shoot, *The Legislature's Power to Correct the Anomaly of Benefitting from a Failure to Preserve an Argument for Appellate Review* at 1335 ["(T)here is nothing in the Constitution or even in the statutes governing the Court of Appeals's jurisdiction that even arguably limits the court to preserved issues of law"]; MacCrate et al, *Appellate Justice in New York* at 83-84 ["Since standards for the exercise of discretion can be properly viewed as 'questions of law,' no constitutional change is necessary"]).

Such a move, whether judicial or legislative, would be welcome. The purpose of the interest of justice is "to allow the letter of the law gracefully and charitably to succumb to the spirit of justice" (*Rickert*, 58 NY2d at 126 [1983], quoting *Davis*, 55 Misc at 659; *see also* John F. Wirenius, *A Model of Discretion: New York's "Interests of Justice" Dismissal Statute*, 58 Alb L Rev 175, 176 [1994] ["Justice is, however, an elusive quality, one which is not always served even by the neutral application of detailed criminal codes promulgated by legislatures"]).

Deciding when the details of the law should give way to its broader purposes is an essential legal question. When to apply the law strictly matters just as much as what its

technical terms mean; both involve quintessential legal questions of who will come within the ambit of the law and how to accomplish the legislature's aims in different contexts (*see Belge*, 41 NY2d at 64 [Jasen, J., dissenting] ["(T)he Legislature specifically left the justice standards open-ended, recognizing the futility of developing all-encompassing rules to cover all situations of injustice"]; *Martel v Clair*, 565 US 648, 663 [2012] ["As its name betrays, the 'interests of justice' standard contemplates a peculiarly context-specific inquiry"]).

Other jurisdictions do not seem to perceive that courts, when they act in the "interest of justice," are engaging in anything extra-legal (*see United States v National City Lines*, 7 FRD 393, 397 [SD Cal 1947] ["The phrase 'in the interest of justice,' like the analogous one which occurs often in statutory enactments, 'in the furtherance of justice,' has a broad meaning . . . . *Both call for the doing of things which bring about the type of justice which results when law is correctly applied and administered*. They import the exercise of discretion which considers both the interests of the defendant and those of society. When commanded by a statute, they do not attempt to determine, in advance, the type of judicial action to be taken"] [emphasis added]; *see also State v Kucharski*, 363 Wis 2d 658, 670, 866 NW2d 697, 703 [2015] [reviewing trial court decision in the interest of justice while mindful that "the ultimate question of whether the evidentiary burden was met would be one for the trier of fact and not for the reviewing court"]).

Nor is there reason to think that the distinction in the State Constitution between issues of law and issues of fact was intended to place interest-of-justice rulings on the "fact" side of the line. The dichotomy of "law" and "fact," reflected in the language of the

Judiciary Article (*see* NY Const, art VI, § 3 [a], § 22 [d]), is expressed as well in the history of the 1894 constitutional convention in which our powers of review were limited to questions of law, and to the Appellate Division were left questions of fact (*see* explanatory statement of the Judiciary Committee, 2 Rev Rec, 1894 NY Constitutional Convention at 462 ["The Court of Appeals is to be strictly limited to its proper province of reviewing questions of law (except in capital cases), leaving the judgments of the Appellate Division final upon all questions of fact"]).

The interest of justice, as a statutory device for tailoring legal codes to the contextual needs of a case, would not need to tread upon the factual findings of the courts below.  That is why the Appellate Division's "weight of the evidence" review is distinct from its review of a judgment in the interest of justice (*compare* CPL 470.15 [5] *with* 470.15 [6]).  In a similar fashion, we have noted that the interest of justice in criminal cases is not concerned with such essential factual determinations as whether the defendant is guilty or innocent (*see Belge*, 41 NY2d at 62-63 [Fuchsberg, J., concurring] ["(CPL 210.40) constitutes the current codification of earlier enactments which expressed the need for a residuum of inherent discretion to act in the unusual case that cries out for fundamental justice beyond the confines of conventional considerations of 'legal or factual merits of the charge or even on the guilt or innocence of the defendant'"], quoting *Clayton*, 41 AD2d at 206).  The foremost example of the lack of congruence between questions of fact and the interest of justice is in the review of unpreserved questions of law—which the Appellate Division may reach pursuant to its interest-of-justice power, but which necessarily are pure questions of law.

If neither the textual nor conceptual bases for limiting our review of factual findings applies to the interest of justice, what about the purposes behind the constitutional division of law and fact? Here too, the relevant considerations support extending a discretionary interest-of-justice power to our court. Doing so would not run afoul of the concerns for managing caseloads that motivated the constitutional distinction between law and fact.[10] Quite the opposite: it can assist judicial efficiency by avoiding redundancy of litigation. Furthermore, as discussed above, settling the law and ensuring its uniformity have been at the forefront of constitutional debates concerning our powers of review (*see* explanatory statement of the Judiciary Committee, 2 Rev Rec, 1894 NY Constitutional Convention at 464 ["The public interests demand that the law should be settled; that it should be the same for the whole State; that it should be a consistent and harmonious system; that it should be declared clearly and authoritatively by some supreme power, in order not merely that litigants may have their right, but that the whole people may know what is the law"]). The ability to reach unpreserved issues of law and to harmonize disparate lower court practices

---

[10] Even the case cited by the majority for the proposition that the Court of Appeals' grant of constitutional "authority was designed to give this Court 'supreme power to authoritatively declare and settle the law uniformly throughout the state'" emphasizes that the limitation of our court's jurisdiction to questions of law was established because "the calendar of the Court of Appeals was then overloaded with work, much of which was unnecessary to settle the law . . . . It was by thus limiting the jurisdiction of this court that it sought to reduce the volume of its business" (*Reed v McCord*, 160 NY 330, 335 [1889]). For the reasons explained above, the interest-of-justice power would aid the court in settling the law and, because it is discretionary, support rather than hamper judicial economy. In any event, granting the Court of Appeals an interest-of-justice power does not require any change to the prohibition that the Court cannot, except in very limited circumstances, review questions of fact.

concerning when to relax the letter of the law in favor of its broader purposes are essential for advancing those constitutional objectives.

## IV.

The majority abandons our prior precedent, albeit for a laudable purpose. I dissent because, under our existing statutory powers, I must. However, the majority has put its finger on issues of geographic disparity, stunted development of the law, and inadequate justice in individual cases. The proper answer is for the legislature to bring our court in line with the other appellate courts and enable us to employ our discretion as needed to make decisions in the interest of justice. No reason now exists to relegate justice to the lower courts only; is justice not our paramount role?

Order reversed and case remitted to the Appellate Term for the Ninth and Tenth Judicial Districts for consideration of issues raised but not determined on the appeal to that Court. Opinion by Chief Judge DiFiore. Judges Rivera, Stein, Fahey and Garcia concur. Judge Wilson dissents and votes to dismiss the appeal in an opinion.

Decided April 1, 2021